No. 13,244.

WILMORE ET AL. *v.* CHAIN O'MINES, INC. ET AL.
(44 P. [2d] 1024)

Decided December 17, 1934.

Original opinion adhered to on rehearing March 14, 1935.

Messrs. DAVIS & WALLBANK, for plaintiffs in error.

Mr. STEPHEN R. CURTIS, Mr. A. K. BARNES, Mr. F. J. KNAUSS, Mr. HERBERT M. MUNROE, Mr. CHARLES A. HASKELL, Mr. HAROLD TAFT KING, for defendants in error.

Mr. PAGE M. BRERETON, Mr. DAVID P. STRICKLER, Mr. F. L. COLLOM, Mr. F. L. JONES, Mr. WILLIAM A. WAY, Mr. CARL A. KAISER, Mr. L. WARD BANNISTER, Messrs. CLAY & BENTON, Mr. WARWICK M. DOWNING, Mr. J. G. HOLLAND, Messrs. LEE, SHAW & McCREERY, Mr. CANTON O'DONNELL, Messrs. PONSFORD & PENDER, Mr. HARRY W. ROBINSON, Mr. DOUGLAS A. ROLLER, Mr. BARNEY L. WHATLEY, Mr. FLOYD J. WILSON, Messrs. FAIRLAMB & FAIRLAMB, Mr. HENRY MC-ALLISTER, amici curiae.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

PLAINTIFFS in error were plaintiffs in the trial court, where they sought to enjoin the pollution of the waters of Clear Creek by defendants with tailings from the latter's mills. The court found generally in favor of plaintiffs, but by its final decree allowed defendants to discharge 670 tons of tailings and slime, per day, into Clear Creek and required plaintiffs to pay their own costs. Error is prosecuted to reverse this decree.

Plaintiffs own farms in Jefferson county, Colorado, with water rights from Clear Creek for irrigation purposes. The defendants operate ore reduction mills located up the river or above plaintiffs' farms, and discharge their mill tailings and slime into the stream which the water holds in suspension carrying them into the ditches and upon the lands of plaintiffs. It is claimed that the water is thereby polluted; that a continuous nuisance is created; that great and irreparable damage is done to plaintiffs' ditches, lands and crops; and that the water is rendered unfit for domestic or irrigation purposes. Plaintiffs seek a full and permanent injunction against this pollution.

Defendants by their answers admit depositing the tailings and slime in the waters of Clear Creek, but deny that more than ten per cent of such reach the lands of plaintiffs and other water users, and claim this pollution to be lawful. Four defenses were set up by the answers:

First. That the tailings were not injurious. Second. Usage and custom in depositing in the stream all mill tailings and slimes from the mills in this watershed for many years. Third. Acquiescence by plaintiffs by reason of their having failed for an unreasonable time to take steps to prevent this pollution. Fourth. That defendants cannot, without an expenditure in excess of profits, dispose of their mill tailings and slimes otherwise than by depositing them into the stream.

Demurrers to the last three defenses were filed and taken under advisement by the court until the case was presented on the merits, and then sustained. Replications were filed denying all new matters and alleging the plaintiffs' water appropriations were long prior, in point of time, to any pretended right of the defendants. The court found this tailings damage to plaintiffs' lands to be immeasurable and irreparable; that there is a point between one ton and 3,000 tons of daily tailings output where the use by the defendants of their water rights for milling purposes becomes unreasonable; that where this point is,.

is not definitely or precisely covered by the evidence, and in determining that point the court must to some extent experiment and rely upon common sense; that 100 to 400 tons of tailings a day put into the stream 20 miles above where taken out for irrigation, would not be an unreasonable use nor do any real damage; that the depositing by the Chain O'Mines company of more than 600 tons a day in the operation of its mill of tailings and slimes into Clear Creek, is unreasonable and causes real damage to plaintiffs; that depositing not more than 70 tons a day by the Mattie Consolidated Mining Company is reasonable and causes no damage to plaintiffs; that defendants have the right to make reasonable experiments to impound their tailings, and the court retained jurisdiction to modify the permanent injunction order to permit the making of reasonable experiments, and to enforce or modify the injunction in accordance with conditions.

The evidence shows the ownership of lands by plaintiffs and the right to divert and use water from Clear Creek for the irrigation of their lands. These rights they exercise, and they raise all kinds of garden and farm products. It required many days to introduce the great mass of detailed evidence showing damage, and the vast preponderance of the evidence justifies a finding of irreparable damage.

The evidence is grouped under 24 subdivisions and emphasizes the following conditions: The headwaters of Clear Creek are in Clear Creek and Gilpin counties and form the stream which flows easterly, entering the South Platte river north of Denver. The principal ditches involved, that divert water from Clear Creek, are six in number and extend 30 miles from the point where the stream leaves the mountains. The defendants' mills, of which complaint is made, are located in the mountains and began the operations, which are claimed to damage plaintiffs, in 1928 and 1929 respectively. These mills grind and pulverize large quantities of ore and the process employed reduces it to finely powdered rock called tailings

and the more finely powdered substance, slimes. These tailings are discharged from the mills into tributaries of Clear Creek or onto ground of steep topography with sudden drainage into the tributaries. Water is used from the tributaries for the grinding process, the mixture becomes one of whitish gray or bluish gray color, and the tailings are not soluble in water. Thirty-three per cent of the tailings from the Chain O'Mines mill pass through a 150 mesh screen which contains 22,500 openings to the square inch. Thirty and nine tenths per cent of the tailings from the Mattie mill pass through a 200 mesh screen which contains 40,000 openings per square inch. The stream in the mountains falls rapidly, there being a difference of 2,000 feet in altitude from its main source to where it leaves the mountains; this condition holds the tailings and slimes in suspension and they are carried into the ditches and upon plaintiffs' lands. Defendants by their answer admit that ten per cent of the tailings and slimes are so carried and deposited. Plaintiffs' Exhibit C discloses the date of water appropriations from Clear Creek for the various ditches. The nature of the claimed damage to plaintiffs' ditches, water rights, lands, crops and proper use, may be stated briefly as follows: Tailings and slimes close and seal the pores of the soil; prevent aeration of roots and plants; prevent water from seeping through the soil; great loss of water; clogs the ditches with deposits; increased labor in cleaning out ditches and hauling away many loads of tailings from ponds and ditches; lower productivity of the soil; increases the necessity for fertilization; lessens marketability of strawberries and other products, after tailings water has run over them they are not fit for use; requires many times more water for irrigation, one irrigation with pond water equaling six irrigations with tailings water; fills reservoirs and lessens the value of lands so irrigated. According to the estimates of Dr. Weinig of the School of Mines, the mill tailings coming down Clear Creek are approximately sixty per cent of the calculated yearly erosion. Plaintiffs'

testimony was to the effect that the cost to the defendant Chain O'Mines Company of impounding its mill tailings would be 4.4 cents per ton. A witness for defendant testified that such impounding could be done for ten cents per ton.

The specific findings of the court on all matters presented was in favor of the plaintiffs, but apparently by its decree it allowed defendants to discharge 670 tons of tailings and slimes per day into Clear Creek on the theory that such discharge was not unreasonable, and it stated that the point between a reasonable and an unreasonable discharge is not definitely fixed by the evidence and that in determining this question, it was necessary for the court to experiment. It further stated that the defendants had a right to make reasonable experiments to impound their mill tailings and the court retained jurisdiction to modify its injunctive orders so as to permit such experimentation, and required plaintiffs to pay their own costs.

The defendant companies contend that their first, second and fourth defenses were good; that the demurrer thereto should not have been sustained and they assign cross-error on the adverse ruling. Said defenses are: First. Usage and custom of operators of reduction mills and plants in the watershed of discharging tailings and slimes into Clear Creek for many years. Second. That at the time the farmers acquired their lands and water rights they knew of the above mentioned custom, raised no objection to the construction of the mills involved, and thereby acquiesced in the construction and operation of the mills, neglecting for an unreasonable time to take any steps to prevent the alleged nuisance. Third. That defendants cannot, without an expenditure in excess of their present or prospective profits, dispose of mill tailings and slimes otherwise than by discharging them into Clear Creek and its tributaries.

Plaintiffs contend that this pollution of the water is in violation of the statutes and constitutes a nuisance that should be enjoined fully and permanently as the pleadings

alone would require; that full injunction should issue regardless of the amount of tailings discharged into Clear Creek, and that the cost of impounding tailings, custom, laches and estoppel, constitute no defense to plaintiffs' cause of action; that plaintiffs should not be required to seek further injunctive orders, and that they should recover their costs expended.

Section 3296, C. L. '21, provides: "In no case shall any person or persons be allowed to flood the property of another person with water, or wash down the tailings of his or their sluice upon the claim or property of other persons, but it shall be the duty of every miner to take care of his own tailings, upon his own property, or become responsible for all damages that may arise therefrom."

Viewed in the light of reason and this particular statute, it would seem that there is no doubt about the correctness of the trial court's finding—which is based upon ample evidence—that there was a violation of the statute and an invasion of plaintiffs' rights. The demurrer to these three defenses was properly sustained. As to the remaining defense, that the tailings were not injurious, there is ample evidence to support the findings of the trial court to the contrary and they therefore will not be disturbed.

It is not necessary to discuss the many questions presented concerning the rights of both the parties touching their priorities or as to the superior rights claimed by defendants for manufacturing or milling purposes, or the question of acquiescence by plaintiffs, for the reason that the question of pollution is determinative of all matters involved. Whatever rights might be claimed by the defendant owners, they cannot justify the claim of a right to pollute the waters of this natural stream. This question is definitely settled by the case of *Suffolk G. M. & M. Co. v. Mining Co.*, 9 Colo. App. 407, 415, 419, 48 Pac. 828, from which we quote the following language: "The lower owners were entitled to have the waters preserved in their purity, that fish might swim, that their stock might

drink, and that the water might be applied to domestic uses. Parties have been restrained from carrying on a business on the banks of a stream whereby polluting matter would by natural seepage, from rains or from any extraneous cause, be carried into the general volume of the water, and diminish its purity and its usefulness. This has been extended so far as to prevent the owners of lands higher up the stream from using their land at their own pleasure, although they had an absolute fee title thereto, in such way as to injure the lower owners, unless such injury proceeded from natural causes over which the parties had no control. Parties have been permitted to mine their own lands, but even thereon and therein they have been restrained from erecting pumping plants, hoisting water to the surface, discharging it into a stream, and letting it flow to their neighbors in such way as to injure the use and destroy the right which the lower owner had theretofore enjoyed." Citing cases. Continuing, the court said: "'The question of balance of injury may possibly be right, and the court may have a right to consider it on an interlocutory application; but we know of no principle by which equity, otherwise having cognizance of the case, should measure the rights of one party by the cost to the other, committing the injury, to prevent either its commission or its continuance. As it was put in the English cases, it would be a sorry condition of the law if the courts were compelled to hold that the property of another might be taken because it would be either inconvenient or expensive to the one committing the nuisance to restrain or prevent its continuance." (Cited with approval in *Krebs v. Hermann,* 90 Colo. 61, 70, 6 P. (2d) 907).

There is an admitted pollution of the water here in question. That a greater portion is polluted than is admitted, is clearly shown by the evidence, and the court so found. It further specifically found that this pollution caused immeasurable and irreparable damage to plaintiffs, however, in the language of the court, "without definite or precise evidence." It also made a finding that

certain tonnage was not unreasonable and venturing an experiment in connection therewith, affirmatively allowed the mills to discharge 670 tons into the stream daily. We do not find any basis in the evidence for this allowance and believe it to be in conflict with equitable principles, with the statutes, and with the decisions of this court. The court's decree in that respect is inconsistent with its findings and is without support in the evidence. The injunction should have been made full and permanent against any and all pollution, and the defendants should not be allowed to experiment to plaintiffs' further damage. After making a finding that the damage to plaintiffs was great and irreparable, it was inconsistent to require them to pay their own costs even though they obtained only a partial abatement of the nuisance for which they are not responsible and which caused their damage.

The acts of the defendants in operating their mills, although contributing in different degrees to the pollution of which complaint is made, combined and taken together operated to produce the damaging results, and each is responsible for the entire resulting damage even though its separate act or neglect alone might not have caused it. In the circumstances neither should escape the effect of a full and permanent injunction.

We therefore affirm the finding of the trial court in part, and remand the cause with directions to enter a decree making the injunction full, complete and permanent.

MR. JUSTICE BUTLER and MR. JUSTICE BOUCK dissent.

MR. JUSTICE BUTLER, dissenting.

The decision of this case works what seems to me to be a grave injustice. Its effect upon the mining and milling industry of the state is bound to be far-reaching and serious.

The suit is by Wilmore and others, in their own behalf and in behalf of others similarly situated. They own

farming lands on the plains and use water from Clear Creek to irrigate their farms. Up the creek, some 20 miles above the headgates of their ditches, are the ore reduction works of the defendants.

The record in this case contains over 4,050 folios. A great mass of evidence, both expert and nonexpert, was taken. The evidence is in sharp conflict, and the trial judge made what is referred to as "a tour of inspection," during which he personally viewed the property affected. The court made elaborate findings. It found, among other things: "* * * that the plaintiffs and those similarly situated have been very much inclined to blame mill tailings for many ills they have suffered and many deficiencies in their soils arising from other sources and defects. The results of lack of water of any kind, insufficient fertilization, unskillful use of irrigating water, improper rotation of crops, negligence in spreading banks of old ditches and years of accumulation of tailings and dead organic matter over virgin soil instead of carting the same away, plant diseases, black root, alfalfa bur, winter kill, etc., shortage of water, soil deficiencies in potash and phosphates, and soil excess of these properties, and nitrates, have all been charged to deposits of tailings. Certainly, the operations of the defendants' mills and the tailings and slimes introduced by the defendants' mills into the stream played but a minor part in the creation of these particular items of damage."

It also found that the mill of the Mattie company has been discharging daily into Chicago Creek, a tributary of Clear Creek, approximately 65 to 70 tons of mill tailings; that such discharge "is reasonable and will cause no real, material and substantial damage to the plaintiffs and others similarly situated"; that the mill of Chain O'Mines has a present output of approximately 2,000 tons of ore a day, which it is the company's intention to increase to 3,000 tons; that it discharged into Clear Creek in 1931 a daily average of approximately 720 tons of mill slimes and tailings, and in 1932 up to July 18 a daily average of

approximately 890 tons; that that was an unreasonable quantity to discharge into the creek, and that its discharge has caused "a real, material and substantial damage to the plaintiffs and others similarly situated"; that that damage is "impossible to reduce to dollars and cents" (in other words, is irreparable and therefore requires injunctive relief); that there is a line that divides a reasonable from an unreasonable discharge; that that line is not precisely fixed by the evidence; that "everyone in this case must concede, if he be honest with himself, that 100, 200, 300 or 400 tons a day of tailings put into this stream twenty miles above where it is taken out for irrigation and mixed with the natural erosive material in said stream, under the facts and circumstances here existing, would not be an unreasonable use of the defendants' water appropriation right, nor would it do any real, material and substantial damage to plaintiffs or others similarly situated." The dividing line between a reasonable and an unreasonable quantity of slimes and tailings to discharge into the stream is not, in the very nature of things, capable of certain, definite ascertainment. From all the evidence, however, and from the judge's personal examination of the property affected, the court fixed that dividing line at 670 tons per day, finding and holding that less than that quantity was reasonable and caused no substantial damage to the plaintiffs and others similarly situated, and that more than that was unreasonable and did cause substantial damage to them. The evidence being in conflict, that finding, according to all the authorities, is conclusive in this proceeding. And properly so, for the trial court saw and heard the witnesses and observed the manner in which they gave their testimony and their demeanor upon the witness stand, an opportunity denied to us. In addition to that, the personal examination of the property gave to the trial judge an understanding of the situation superior to that obtained by us from a perusal of the printed record. Based upon its findings, the trial court enjoined Chain O'Mines from discharging

into Clear Creek, or any tributary thereof, slimes and tailings in excess of 600 tons per day, and enjoined the Mattie company from discharging therein slimes and tailings in excess of 70 tons per day. Realizing, however, the impossibility of arriving at absolute certainty in such a difficult and complicated matter, and that the enforcement of the injunction in strict accordance with its terms might produce consequences not foreseen by the court and work an injustice upon the plaintiffs or the defendants, the court, in the exercise of its well-established equity power, properly retained jurisdiction to make such modification of the injunction from time to time as justice might require. In no other way could the rights of all parties be adequately protected. In taking that course, the trial court displayed a keen appreciation of the difficulties presented, and judicial wisdom and fairness in dealing therewith.

The defendants, of course, should be restrained from discharging into the creek such quantities of slimes and tailings as would cause real, material and substantial damage to the plaintiffs and others similarly situated. Anything short of that would be an injustice to the plaintiffs; anything in excess of that would be an injustice to the defendants. By its decision this court orders the trial court to go far beyond what equity practice warrants. It orders that court to enjoin the defendants perpetually from discharging into the creek, not only such quantities of slimes and tailings as would cause such damage, but also quantities of slimes and tailings that the trial court found, upon full consideration of all the facts and circumstances, would not and could not cause such damage. An injunction is a drastic remedy and never should go beyond the necessity of the occasion.

The holding in this case, if adhered to, would seriously and unjustly cripple the mining and milling industry, one of the great industries of this state; an industry that caused the settlement of this region, and to which the state owes its birth in 1876, its financial salvation during

the panic of 1893, and a large measure of its prosperity at all times.

I am firmly convinced that the judgment of the district court is a righteous one and should be affirmed; therefore I dissent.

Mr. Justice Bouck concurs in this dissenting opinion.

## On Rehearing.

Mr. Justice Holland.

■■ In the original opinion, the thing enjoined is pollution. On rehearing, it has been argued, in substance, that the introduction of any quantity of extraneous matter into this stream, would be a violation of the injunction. That does not follow. For the purposes of this case, the word "pollution" means an impairment, with attendant injury, to the use of the water that plaintiffs are entitled to make. Unless the introduction of extraneous matter so unfavorably affects such use, the condition created is short of pollution. In reality, the thing forbidden is the injury. The quantity introduced is immaterial. A primary duty rests upon one introducing such extraneous matter into this stream to prevent damage from arising from such introduction, either from his acts alone, or in conjunction with those of others. Failing in this, he must answer at his peril.

The original opinion is adhered to.

Mr. Chief Justice Butler and Mr. Justice Bouck dissent from the order adhering to the original opinion.

Mr. Justice Campbell not participating.

Mr. Justice Bouck, dissenting.

The original opinion was handed down on December 17, 1934. A rehearing was granted. Many outstanding attorneys of the state were then given leave to file briefs as amici curiae. Some of these were not only specialists

in mining law, but also specialists in irrigation law and thoroughly familiar with the legal, equitable and practical aspects of both fields. They were all agreed on the proposition that this court had erred in its broad pronouncement of the principles and practice applicable to the case at bar. There was oral argument, at which this proposition was emphasized by the amicus curiae who was chosen to argue orally on behalf of himself and all the others. The majority of the court has now seen fit to file a supplemental opinion on rehearing, announcing that the original opinion is adhered to and apparently being intended to explain it.

I respectfully submit that the logic of the dissenting opinion filed by the present Chief Justice remains unanswered.

As I read the original and the supplemental opinion, they mean:

1. The majority has selected for approval some of the findings made by the trial court, and has rejected—contrary to a universally recognized principle—other findings made, as were the others, upon conflicting evidence from witnesses whom the lower court, unlike ourselves, has seen and heard. The result is that this court has substituted its own findings for the findings thus duly entered below. If there were error in the findings, the case should be sent back to the trial court for a new trial at which any errors could be corrected, but only by making proper findings in that court. To say that the findings of the lower court sustain the partial reversal by this court of the judgment below is to ignore a substantial portion of the findings themselves, as was pointed out in the dissenting opinion.

2. The majority says in its original opinion that "viewed in the light of reason and this particular statute, it would seem that there is no doubt about the correctness of the trial court's finding—which is based upon ample evidence—that there was a violation of the statute and an invasion of plaintiffs' rights."

The statute referred to provides that "it shall be the duty of every miner to take care of his own tailings, upon his own property, *or become responsible for all damages that may arise therefrom.*" (Italics are mine.)

This very statute thus recognizes the fundamental rule that only where the injury is irreparable does equity have the power to enjoin, but that in other cases the injured party shall be relegated to his action for damages. We are not unfamiliar in Colorado with the procedure which contemplates the mere recovery of damages in cases of continuing nuisance. *Home Supply Ditch Co. v. Hamlin,* 6 Colo. App. 341, 40 Pac. 582; *Jackson v. Kiel,* 13 Colo. 378, 22 Pac. 504.

The majority errs, therefore, in virtually laying down the general proposition that one who dumps tailings renders himself liable in any event to an injunction. That attitude is contrary both to the aforesaid statute and to the elementary principles of the injunctive jurisdiction. Whereas, under the findings below, the dumping of 670 tons per day into Clear Creek has been regularly determined by the trial court to be harmless, and the injunction was therefore limited to amounts in excess thereof, the majority in its supplemental opinion emphasizes that whenever there is a dumping of "extraneous matter" which "so unfavorably affects" "the use of the water that plaintiffs are entitled to make" as to bring "impairment, with attendant injury," to such use—and the supplemental opinion says that "the quantity introduced is immaterial"—then the dumping must be enjoined. It is difficult to see how this viewpoint fits into any authentic modern conception of the relative functions allotted to legal and equitable remedies. To say that, merely because a thing is forbidden by statute, the court must issue its injunction against any violation, is to throw the whole doctrine of damages and compensation to the winds. It is obviously a judicial repeal of the hitherto fundamental system whereby actions are brought to recover damages, and a judicial repeal as well of the

exemption even from liability for damages under the principle of *damnum absque injuria.*

In conclusion, I can only express my keen regret that the supplemental opinion undertakes to advance and insist upon such views, and particularly by its final warning, so fraught with potential terror for the mine or mill operator who desires to be law-abiding: ''Failing in this, he must answer *at his peril.''*